Good morning, Your Honor. May it please the Court? My name is Steve Herman from Herman Mathis for the Appellants. And unless the Court would like me to address a particular issue, I thought it might be helpful to go through an illustration of a transaction that would demonstrate injury in fact under the Lujan test. When Mr. Glanton goes in to buy a generic drug from a retail pharmacy, the price of that drug is calculated generally by Advance PCS on what's called maximum allowable cost or MAC. And this isn't a set pre-negotiated price. This is something that is constantly changing that is set in the discretion of Advance PCS, we believe discovery will prove. Little known when this case was filed and little known today, what we believe discovery will show is that Advance PCS also creates a separate MAC which it uses to pay the retail pharmacy. So, for example, the plan might be charged $9 for a generic drug and the retail pharmacy might only be paid $2 for a generic drug, calling both of those prices MAC, both of them set in the defendant's discretion. And Mr. Glanton is charged $6 out of his own pocket as a copayment and then the rest of the purchase price or the other $3 in this scenario, say it was $9 purchase price, will be paid by the plan sponsor. So the unjust enrichment to Advance in this transaction is being contributed to both by the participant and by the plan sponsor. So you think the pharmacy should keep the money? Do I think the pharmacy should keep the money? Yeah. No, Your Honor. I believe that the money should be returned to the plan. Well, if you say they can't take the money, you know, the most likely thing that will happen is the pharmacy will keep the money. That's one possibility, right? If they can't get the rebates or the discounts or spreads or whatever you call them, maybe they just won't get them. And what assurances are that they will, you know, bargain for these things just so they can turn them over to your clients? Oh, you mean in the future? Yeah.  But for the past however many years, they have already. I'm sorry. You're talking retrospectively. Okay. Yes, Your Honor. So we know they got these funds, and your claim is that they should turn them over to the funds. Correct. And how will that affect your client? Well, if my client is Mr. Glanton, it will affect the clients in four ways. First of all, for Ms. Magner. I mean, I would guess the plan sponsor would see the big infusion of cash there and say, oh, that's great. We're not going to have to put money into that stupid fund anymore for a while. That's what I would do if I were a greedy employer, which we all know they are. I think even assuming that that's the case, the benefit that the participants get. Why wouldn't that be the case? I mean, if you were the plan sponsor, there you are shoveling money like coal into a locomotive, and all of a sudden you see that there's more money in there. Why would you do anything else? Well, in the time being, that money has to be kept in trust for the participants and the beneficiaries, and the participants and beneficiaries get the financial security of knowing that those funds are going to be held in trust so that even if the plan sponsor goes into bankruptcy or terminates the plan or something of that nature happens, then they have the financial security, which interest was recognized by the Supreme Court in Russell. And admittedly, that's indicted, and that's not an Article III case, but that was specifically recognized as the participants' interest in the recovery, which has also been noted in other cases. In addition, that's not the only remedy that might befall the participants and the beneficiaries. That's the most straightforward remedy under 502A2. But there also is the opportunity for a remedy, particularly with respect to the portion that comes out of the participant's own pocket, under 502A3 for either equitable restitution or some kind of constructive trust that could be compensated to the actual participants and beneficiaries or former participants and beneficiaries. And that type of remedy has been approved under similar type circumstances. How would you devise that? Because you said in the ‑‑ I mean, what you say is, okay, look, we'll make the past look like the future, and now that we've solved the problem, so we have to sort of deal with the future. How do we know? I mean, in the future, nothing's going to change, right? Well, Your Honor, I would suggest that in the future it will change, because once these practices come to light and if the defendants are enjoined and these practices are remediated, what that is going to do is that's going to bring down the overall cost of prescription drug payments. And through evidence, through experience, through just somewhat the negotiation process between the participants and their sponsors, what is likely to happen is that the contributions made by the participants and the beneficiaries are going to at least not be increased so drastically, if not reduced. And even in cases that were cited by the defendants, acknowledge the fact that these copayments and these contributions by the planned participants are used to defray the overall cost. And there's very little evidence. Isn't that highly speculative? I mean, that's the point that your opposing counsel makes, is that this is really speculative. You have to do a lot of guessing about what a lot of parties now before the court would do before you, before you reach this conclusion. It could just as well be that the employer will say, well, look, I can save lots of money on the pension plan. I will not only, I will raise copayments and I'll put less money in, and nothing prevents the employer from doing that, right? Nothing prevents the employer from doing that except for the forces of the market face, the experience. I would analogize this to a loss of future wages. It's ultimately speculation as to whether a third party now before the court, an employer, a prospective employer would employ somebody or how much that person would be paid or compensated. But we have experience upon which we can draw to reasonably predict that. With respect to past losses, it's actual numbers, it's actual dollars. I don't know what it is standing here before you, but somebody will be able to compute that on X amount of purchases, this amount of money, this specific race, so to speak, was inappropriately converted. And some of the cases cited by the defendants, Article III cases, talk about the unfettered choices of third parties not before the court. Well, the plan sponsor's choices, with all due respect, are not completely unfettered. They are bound by the anti-annulment provisions which require them to use any recovery for the benefit of participants and beneficiaries. The anti-what? The anti-annulment provisions. I'm sorry, Your Honor. Section 403A and C-1. I'm not sure. I think it's ANTI-INUREMENT. Human. Human. Okay. I'm sorry. I apologize. Yeah, okay. I got it. And so they have to hold that money. That just sounds so different from what I hear. Okay. That's fine. Counsel, one second. We're talking about standing, right? Yes, Your Honor. I have a lot of trouble with Mackner's standing at this point, but aside from that. So all we're talking about is do the beneficiaries have constitutional and otherwise standing to bring this action to cause disgorgement by a fiduciary back to the plan, right? Yes, Your Honor. Or some other appropriate equitable remedy, which might be equitable restitution or a constructive trust that's dispersed to participants and former participants, including Ms. Mackner herself. That means that they can actually get back, that they, in this lawsuit under ERISA, can require that they be paid back some portion of the copayment they made. What's your best case that says that? My best case in terms of the site or my argument? Yeah. In terms of the site. Because it sounds like a fairly large extension of, quote, especially after the Supreme Court has taught us about equitable remedies. It sounds like that part of your case that you're arguing today, anyway, is just a straight argument for damages. You did big naughty. We paid too much in copay, and therefore we want the money back. That doesn't sound like an action on behalf of the plan. It doesn't sound like anything else. Well, Your Honor, the defendants are going to argue, I assume. I don't care what they're going to argue. I'm just asking what your best case is that you can actually bring a lawsuit to get back the copay that were made to pharmacies because they somehow breached some sort of fiduciary duty somewhere. That's all I'm asking for. Okay. Because, Your Honor, it's not necessarily a loss to the participant. The participant and the plan sponsor haven't actually necessarily paid more. It's kind of two sides of the same coin. By case, we did agree that we meant authority, right? And you're going to tell me what's your best authority for the proposition that they can sue in this ERISA case against a fiduciary. They can bring this ERISA action to get back additional money. That's what I want. In talking about Ms. McNair, I would say that we're not talking about getting for the plan now. We're talking about your argument that they have the right to sue to get back some part of the copay that they made at some time to some pharmacy somewhere. I think it would be Matthews versus Chevron, Waller, and Amalgamated. And all of those cases indicate that you fit within one of the four classifications that allow you to sue? Yes, Your Honor. I believe so. Okay. Over your ten minutes, if you wanted to. I'd like to defer a few minutes to Ms. Williams, who's here from the Department of Labor.  Thank you, Your Honor. Good morning. May it please the Court, my name is Kimberly Williams, and I'm representing the United States Department of Labor. And we file a brief as amicus in this litigation on the legal issues. And those issues are, we feel that in granting the motion to dismiss the district court error when it concluded that ERISA does not authorize participants and beneficiaries to seek relief on behalf of a plan against an entity that is not a named fiduciary. Ms. Williams, was there any reason why the Department of Labor didn't bring the suit itself? The Department of Labor has limited resources, and we bring some losses, but this particular case, and I've asked that question, is very fact-intensive to investigate this type of case, and it requires a lot of resources to bring it. But because we take the position that plan participants, plan beneficiaries, other fiduciaries, as well as the Secretary of Labor, can bring an action for a fiduciary breach. On behalf of the plan. On behalf of the plan. And in this case, we feel that a motion to dismiss, the court's motion to dismiss, would deprive those parties of bringing an action. We're not, the Department of Labor is not taking a position on whether or not advance is a fiduciary. We think that that would be properly disposed of, properly brought out in discovery during the under merits of the case. We're not taking a position as to whether or not these rebates that are coming back are plan assets. Again, we have not seen the contract in this case. We do notice that there are contracts between these pharmacy benefit managers and the employers, and they're all different. We've seen some contracts, but we have not seen the one in this case. Do you agree that a person bringing the suit needs to have autocracy standing on his own right? If it is a bit. That Mr. Glanton has to have suffered injury on his own right. Since he's bringing the plan on behalf of the, the lawsuit on behalf of the plan, is it enough that the plan has injury, or does he have to have individual? If he's bringing the action, and they have brought the action under 50282, it's the plan, he brings it on behalf of the plan. So as far as the Department of Labor is concerned, Congress could give the right to bring this lawsuit on behalf of the plan to anybody? It could just take somebody off the street and say, look, we give you the right to bring this lawsuit? Whether they have any direct connection to the plan at all? Well, Congress has named those four classes of plaintiffs who can bring the lawsuit, and they've limited to plan participants, beneficiaries, and the secretary. I understand, but I'm asking you, let's say they decided to become more expensive and saying, that's just not enough people. Able to bring the plan, we don't have enough business in the courts, we don't think these things are being policed enough. So we're going to say that anybody can bring this lawsuit, any U.S. citizen can bring a lawsuit on behalf of the plan. Can Congress do that? Or does the individual have to have a personal stake in the outcome? Well, as a plan participant and a plan beneficiary, they do have a personal stake in the lawsuit. The plan benefits those individuals. So to that extent, I think it would be limited to... I think people are covered by the plan. Yes, people are covered by the plan. The answer to my question is no. They couldn't just give the right to it. No, they couldn't give it to any... and they should not. Why not? Why not? What if they said, look, we're so concerned about having... that there's not enough enforcement. We're going to give local prosecutors, local DAs, city attorneys, just like we have... the Department of Labor doesn't have enough resources. We have to cheapen Congress to give them more resources. And so what we're going to say is that state attorneys general can bring these suits on behalf of the plans. Well, the state's attorneys generals are bringing... in fact, the state attorney general in New York is bringing one. He may be up against preemption. I know the state of Maine brought a similar action as against these pharmacy benefit managers, and it was held to be preempted by ERISA. And I don't know what the outcome of New York... I'm saying bring the claim under ERISA. Well, they were bringing it under ERISA, but they were held to be preempted as not being able to bring... as being... as their lawsuits were preempted by ERISA. Do you want to save the rest of the time for a bottle? We have about three and a half minutes on your side. Save my time? Yeah. Oh, yes, I do want to save some time, but I would like to just add one little... You can both save and add. You can do one or the other. When you add, you don't save. That if any party... if the secretary of labor can bring an action against a plan fiduciary, then so can a plan... a name as well as a functional, then so can a plan participant or beneficiary. Thank you. May it please the Court, my name is Paul Andrasik. I'm here on behalf of Advanced PCS. As the Court knows from the papers, Advanced PCS is one of the largest pharmacy benefit managers in the United States. And as a pharmacy benefit manager, it offers its clients a variety of products and services that are designed to assist the plan sponsor in administering the program and in controlling the cost of those programs. Now, who are the clients that Advanced PCS serves? I can tell you who they are not. They are not the participants and beneficiaries. They are not the plaintiffs in this lawsuit. Their clients are sophisticated insurance companies. They're HMOs. Are there plans clients? Your Honor, there are. Sometimes there are directly the plan is a client. Let me ask you in this case. In this case... I mean, maybe it's not in the record. It's not in the record, but I believe in this case the plan sponsor, Alcoa and Kmart, entered into contracts with Advanced PCS to provide benefit services with respect to their plans. That would be the typical case. In the lawsuit that's being brought on behalf of the plans, the plans have standing, right? The plans, the fiduciary of the plan would have standing to bring the case. But the plans themselves have injury, in fact. We don't... As alleged. Assuming there is injury, but they've alleged it. As allegedly complained, the plans themselves have injury, in fact. They have alleged violations of ERISA that would give rise to the cause of action if brought by a party with standing. So wouldn't beneficiaries of those plans have standing? We don't think so, Your Honor. And I think it's very telling that the parties who contract with Advanced PCS, the parties who essentially have their money at risk, they're not here. What we have are participants and beneficiaries who want to bring this case on behalf of the plan, and what do they allege? They don't allege any personal injury. They do not contend, for example, Your Honor, that they were denied any benefits under the plan. They concede that they received the full benefits. In fact, if you look at page 11 of the reply brief, they said they have not alleged injury due to a denial of benefits, to a payment of reduced benefits, inferior care, negligence, or breach of contract. They've gotten their full plan benefits here. That's not at issue. What they're saying is that their plans... Why does that make a difference? Suppose the plan had $2 million in its kitty, and your company as a fiduciary of the plan plundered part of it. Are you saying the beneficiaries could not sue? I'm sorry, Your Honor, I couldn't hear the part of your question. I said suppose there's $2 million in the kitty, and you are a fiduciary of the plan. Let's assume that. And you've taken $500,000 of it. Are you saying that the plan beneficiaries could not sue to have the money replaced in the plan, even though they have not yet had money out of pocket? Are you saying that? Your Honor, I would say under the Harley case from the Eighth Circuit, they would not have standing in a defined benefit plan that was fully funded. I'm not talking about a defined benefit plan. I'm talking about a welfare plan, which I think we're talking about, are we not? That's right. We're talking about a welfare plan. Okay. And there's $2 million in this welfare plan, and it's there for the purpose of taking care of the beneficiaries from now to eternity. And your company has taken $500,000 out of it. Are you saying that the beneficiaries could not sue to have it put back in? If they could show that there was a threat to their benefits, that their benefit, that the integrity of the benefit promise is somehow threatened. Did you hear my question? I'm not talking about threats to their integrity. I'm talking about there's $2 million there, and it's in the plan, and the plan is for the purpose of benefiting them. And what they know is that you took $500,000 out of it. My question is, has Congress conferred upon them constitutionally the power to sue to have the fiduciary replace the $500,000? I think in that particular case, in that case, they would have an injury, in fact, to the benefit integrity of the plan, and they would have to have that injury. That's not this case, Your Honor, because a welfare plan is specifically exempted from ERISA's funding requirements. There's no trust in these cases. I'm not talking about a funding requirement. I'm talking about the money is, in fact, there. Let me put it a different way. I'm the beneficiary of a trust, and the trust has $2 million. And I'm entitled to get some kind of payment from the trust, and you're the trustee of the trust, and you take out half the money. It hasn't affected my payment yet, but you've taken out half the money, and you've done it wrongfully. Or you're investing it like a nutcase. You're putting it in penny stocks that haven't gone down yet, but you're putting it in penny stocks. Are you saying as a beneficiary I cannot sue under normal trust theory? Under normal trust theory, under common law theory, possibly. I would have standing, possibly. Under common law theory, but that's not this case. Because in this case, what they are alleging, they are not alleging any interest to their own interest. When you're talking about a trust fund where they might have some stake in the outcome, where that might affect their benefit rights, that's a different case than this, because in ERISA's welfare plans, they're not subject to the trust requirement of ERISA. In this particular case, there is no trust fund. Alcoa's plan, the only evidence that's in the record is the Alcoa plan, and as the form 5500 to the Alcoa plan was attached to one of our motions to dismiss below, to our motion for judgment, the amended complaint, and that 5500 demonstrates that there was no trust fund here. These benefits are funded out of the general assets of the employer. The employer pays for the benefits. It's the employer's money that's at stake here. And what we have here is a situation where it's simply speculative that these plaintiffs would have any benefit. I guess the question I would have is why, if the plan is, has injuring effect, why the person that brings the lawsuit on behalf of the plan has to have independent injuring effect? For example, if you have a minor with a claim and the court appoints a guardian ad litem to prosecute the claim on behalf of the minor, and the minor has no capacity, the guardian may be uncompensated, usually is uncompensated, has no stake in the outcome of the case because the claim belongs to the minor. There's no problem with standing there because all you have is a third party who is conducting the lawsuit on behalf of a party that does have injury and does have standing. In that particular case, Your Honor, you do have a true representative of the plan bringing the action, someone who is accountable and who has legal obligations to prosecute that action in an appropriate manner. If you have a situation... I'm sorry to be brief, but I'm not sure why that makes a difference for purposes of Article III standing. Well, I think it makes a difference, Your Honor, because in those cases, it's been recognized that there is a legal duty on behalf of a trustee. A trustee has an obligation to the participants and the beneficiaries of the plan. If it violates that obligation, if it doesn't take appropriate action in prosecuting the suit, it is itself subject to suit. It's violating its own duties. There is accountability. I mean, maybe so, but what does that have to do with injury in fact? Injury in fact, the trustee is the proper party for bringing the action on behalf of the... Well, take the United States here. You concede that the Department of Labor could bring this lawsuit if it chose to. What injury in fact is the Department of Labor subject to? The Department of Labor is the representative of the government, and it would be recognized as the injury to the sovereign in the violation of its laws. That's the injury that would be at stake in a case like this that they pursue. They have an interest that's separate and distinct from the plan's participants and beneficiaries and from the trust fund. They have an interest as a government in seeing that the law is enforced properly, and the government has taken that position in arguing that they are not bound by private settlements and litigation of this type, the fiduciary breach litigation, that they have interest separate and distinct from the participants and beneficiaries. That would be the charter case that was decided by the Eleventh Circuit. Well, what I'm talking about is in a case where you have a participant and beneficiary who has no, suffered no injury, they have no stake in the outcome of the case. If horror of horrors, we gave them standing, let's say that happened, the court says, yep, they've got standing. Worst possible scenario. And they sue, and they get $2 million or $10 million out of your company. Where does the money go, do you know? Your Honor, I don't think it would go to the plan in a case like this. I don't think that's true in a case like this because these are employee benefit plans that are funded out of the general assets of the employer. It's the employer's money that's at risk. So I don't think it's a foregone conclusion that it would go back to the plan. It would go back. The employer has borne the risk, and it's money been spent. When you say it's not a foregone conclusion, that sounds, some people might say, a little wishy-washy. It may not be foregone. Your Honor, I don't think it should. I don't know of any case that holds that money would go back to the plan in a situation like this. I'm sorry, but what is the affirmative answer to Judge Finan's question? You said it wouldn't go to the plan. Where do you think the money would go? I think it would go to the employer because the employer funds the plans portion of the benefit in a case like this. This money comes out of the general assets of the employer. If those assets have been inappropriately used, you would expect the employer to be in here suing to get its money because these are monies that go to fund the benefit programs that it supports. They are responsible for the cost of this program, not the participants and beneficiaries. And I think it's clear that it's just rank speculation that the participants would receive any benefit from a recovery here. First of all, it's not clear that the plan wouldn't receive benefits from it. Even if the money went to the plan, it would not be used for their benefit. If somehow Alcoa had to create a trust to get the money here, because it normally would not have to have a trust for this type of plan, then the question would be how is that money used. And it's entirely proper for the employer to alter the terms of its benefit program. It doesn't have to sweeten the benefit program to lower the deductibles for the plaintiffs to change the copayments. It can simply ride out that surplus and not make any further contributions to the plan. And that would be perfectly equitable under the circumstances here because it's their money in the first instance. And I think the plan would benefit, though, would it not? But not these participants and beneficiaries. They have no stake in the outcome. So they're in one of those classifications that are allowed to bring this lawsuit against a fiduciary. Your Honor, I think that Congress can give statutory standing, but I don't think it can confer constitutional standing on parties that don't have it. I think that's clear from the Lujan case and a number of cases that we cite in our papers. And what we can – our position here is that they have no personal stake in the outcome of this case because they have no constitutional injury. If the plan isn't a trust, what is it? The plan is basically a contract. It's a representation that the employer will provide certain benefits to its employees and that in the welfare plan context, ERISA has funding requirements for pension plans. And if you have a pension plan, you must have a plan, trust, because the pension plan must have assets. Congress mandated that assets had to be, in effect, put aside at a separate trust apart from the employer to pay – to assure that those pension promises were met over time. Congress exempted welfare plans from those funding requirements in Section 301 of ERISA. So they don't – so what you have here is essentially a contract that says under certain circumstances – So let's say that the plan suffered huge losses one year. No, I mean epidemic or something. And, you know, are you saying the employer would be liable by – its general assets would be liable for meeting those obligations? I hate to give you a yes or no answer, Your Honor. And I'll give you a yes or no answer because unlike pension plans, there are no vested benefits in welfare plans. The employer can terminate that plan at will, and it owes no further money. It's a different type of obligation. Follow along with me, Mr. Andrasik. Let's say that, you know, all of a sudden there's an epidemic. You know, God forbid, and I really hate to talk about these things, but let's say that all of a sudden, you know, one month, every employee has to go out and get this particular medicine because, you know, there's a problem. And so, you know, they're going along and they're spending $10,000 a month, and one month it's a million dollars because of this. So the bills come in, and obviously there's not enough money in the fund, whatever they set aside for it, because it's just such a huge expense. Who would be liable for that? Is the employer's general assets? In that case, Your Honor, it would be the general assets of the employer. The employer would have made the promise. It would have supported its benefit promise with its own assets. It doesn't have to have a separate trust fund. Now, what most employers would do in that situation. And in this case, I'm sorry, go ahead. What most employers would do in that situation would be that they would have backup insurance that they pay for in the form of stop-loss insurance to cover any catastrophic losses. But that would be their way of managing what is their debt. But it's the employer's responsibility to manage the cost of the program. That's why they hire entities like PCS, Advanced PCS, to help them do that. And the employers aren't suing Advanced PCS. These are participants. And in answer to Judge Bernanase's question, there is no case that suggests their plaintiffs would get any money back in a situation like this. You asked for their authority. None of the cases they cited, those were pension plan cases. They were not welfare plan cases. And I think what they've done is they've conceded in their papers that any redressable injury here is just speculative. The plaintiffs themselves say in their brief that they don't know what the fiduciaries are going to do with the money. They said that below. And I call the Court's attention to page 20 and 21 of the Department of Labor's brief, where the Department of Labor confirms that it's pure speculation that any recovery would go to satisfy the interests of the participants and beneficiaries. And let me quote from their brief. It says, if the rebates and discounts are returned to the plans, it is possible that the resulting cost reductions or monetary relief to the plan will benefit the participants and beneficiaries in the form of lower copayments and less restrictive formularies, and possibly a more comprehensive benefit structure. Although the plan's sponsors may take any recovered rebates and discounts and use these funds at their own disposal, this does not foreclose the possibility that the impellents may benefit directly from a judgment in their favor. So the Department of Labor, in its amicus brief, concedes that it would be entirely appropriate for the employer to use any recovery here to cover its benefit costs, and that it's just rank speculation that any benefit would flow to satisfy the injuries, and the only injuries they have alleged, that the plaintiffs have alleged to their own person, is that their benefit plan wasn't better, that the deductibles were too high or the copayments were too high, and they're saying that maybe if there's a recovery, the plan sponsor, the employer who's not here, will take action to change those benefit programs in their favor. In the prior cases you heard today, that's a plan sponsor function not covered by ERISA. In your view, when they get this humongous recovery against your client and it comes back, and the employer has fallen on hard times, can it take that money and, say, use it to pay off debts to other suppliers, never mind the plan at all, just say, we paid money in the first place, we got it back, we're going to use it to pay off our debt to General Motors? Your Honor, if it goes back to their general assets, I think they could do that. Okay. We don't know any case out there. It's possible. It's possible. Just like the Department of Labor says that it's possible on the other side. But possible is not good enough for constitutional standards. What you're saying is the money belongs to the employer, period. If I understand it right, it's not relevant to talk about the money belonging to the plan. There ain't a plan that has money. The money always comes from the employer, to the employer, from the employer, et cetera. Is that correct? I know that from the Alcoa case and the record in this case. The record hasn't been fully developed. But what I'm saying is whether it goes back to the employer, this is on a motion to dismiss, whether the money goes back to the employer or whether some trust fund is constructed to hold it, the benefit can go entirely to the employer and properly so under ERISA. And that doesn't violate the Anion-Nerman clause of ERISA because all the money is there would just be running out. It would be a wasting trust. The employer would say, I'm not going to fund any more money. I'm not going to fund these benefits. The money is there. We have this recovery. As Justice Kaczynski said, hooray, we don't have a funding obligation for a period of time. We'll run it out. We're not going to make their benefit program any better than it was before. That's perfectly permissible under ERISA. Your Honor, I did hit a number of the points that I'd like to address, but one point we do suggest is that even if the court determined that there was adequate injury here, on the plan's behalf, sufficient to give them standing, we would suggest that the plan's injury was sufficient to confer standing on participants in the constitutional sense. We would suggest that the court should exercise its discretion not to give them standing where they have not. First, go on to the named fiduciaries and ask that those named fiduciaries bring an action to protect the plan's interest. And we say that because we don't think these are good plaintiffs. They don't owe duties to anybody. And you can ask the representative of the Labor Department when they get back up here. If the plan participants would settle this suit, if Mr. Glanton settles this suit, that wouldn't bind a fiduciary from bringing a subsequent action. It wouldn't bind another participant from bringing a subsequent action. They are not good representatives of the plan because they're really not the plan's agents, and they have no authority to bind anybody. Thank you, Your Honor. You've got about three minutes for a bottle. Briefly, if I could draw off of Your Honor's analogy. The $2 million, the way we see it, goes to Advanced PCS. And based on their prohibited transactions and self-dealing, that gets parlayed into $2.5 million. And so it's that $500,000 that we believe should be returned to the plan. We believe that that should be held in trust, and I would note that 29 U.S.C. 1103 refers to employee benefit plans and is not limited to pension plans. And the Patelco case decided by the Ninth Circuit, for example, found these types of violations with plan assets, and that was a health plan and a welfare benefit plan situation, not a pension plan situation. That's 262 F. 3rd, 897. Your Honor asked about the best cases for distribution back to the participants, and that's particularly relevant in Ms. Mackner's case. With respect to Mr. Glanton and the Alcoa plan, under 409A enforced by Section 502A2, there is a right of the plan or on behalf of the plan, as representative of the plan, to disgorge the ill-gotten gains, the extra .5 million in our hypothetical. That is a benefit to Mr. Glanton as a plan participant in several ways we submit because the third party that's not before the court, the plan sponsor's hands are tied. He doesn't have an unfettered right to pay off the mortgage or do whatever he wants with the money. He has to use it for participants and beneficiaries. Why is that? Well, I believe that 11, the statute I cited, 29 U.S.C. 1103A and C.1, which applies to all employee benefit plans, which include welfare plans as well as pension plans, requires that once the plan assets are segregated, once there are plan assets, because the money has been segregated to pay for the benefits, that that money can never be refunded in this plan. We keep funding it recurrent. And now this booty comes in as a result of this lawsuit. That's a booty. We'll take it. And, you know, we're not delinquent in any way. You know, we're keeping up with this plan. But we'll just take this money and pay off our creditors. What prevents that? Well, we submit that 29 U.S.C. 1103A and C.1 prevent them from doing that because it says once you have plan assets, they can never inure back to the benefit of the plan sponsor. And in the meantime, you're giving financial integrity to the plan, which is of a benefit to the participants and beneficiaries as recognized in Russell. And the speculation regarding what in the long run is going to happen in terms of benefit design. Why are the employers here complaining? Why are the employers here complaining? If it's such a raw deal and advanced PCS is making all this secret money and all that, why are they here complaining? They can hire lawyers, too. They probably are as interested in the money as anybody, right? Why are they here complaining? Well, I'm not sure, Your Honor, but I think it might just come down to human nature in the sense that you're going to have somebody, realistically, who's in the benefits department of Alcoa who wants to get promoted, and that person was given the responsibility of dealing with advanced PCS. He doesn't want to go to his employer and admit that he got duped. You're going to have consultants that are advising them that knew or should have known of advanced PCS's secret practices. They don't want to admit that they were wrong. Yeah, but once you've told them about these problems, they don't want to sit by and do nothing either. I can't explain their inaction, but the only thing that I can say is that the purpose of arrest was to protect the participants and beneficiaries from fiduciaries that might just sit on the rights. Let's say we say you go ahead and you can go ahead with this lawsuit. You go with the class to get together, and he makes you an offer that's very generous, and you say, oh, gee, that's pretty good for my client. I'll settle it. Does that bind the trust? Does that bind the next, the next, the judge, I'm sorry, the partner in labor? Once they bring a lawsuit, does it bind the next plan participant who says, wait a minute, I don't think that's such a great deal. Glanton got paid off, and his lawyer got paid off handsomely, but we don't think the trust got enough. Is that binding on the next, next, next plan participant? Well, I think arguably it would be raised judicata, but what I would think would happen would be one of two things. Either they would feel uncomfortable settling just with me, and they would feel the necessity to make sure that they have a valid release to get the plan fiduciaries to sign off on it, or by accepting the money, the plan fiduciaries would basically have it in court a satisfaction situation, at least for the race that was in dispute. Okay. Thank you. Thank you very much, Your Honor. Thank you. Okay. Case just argued. We stand submitted. We are adjourned.
judges: Kozinski, Fernandez, Hatter